We now move from the groin to the bone. Our next case is Four Mile Bay v. Zimmer Biomet Holdings, 2017-2017. Mr. Lyron. Yes, sir. Lyron O'Lyron. May it please the Court, my name is Philip Lyron. I am counsel for Four Mile Bay Patent Owner. I am also the inventor of the 582 patent. This case presents four important legal issues relating to claim construction that will significantly impact the PTAB and IPR and PGR proceedings. These four legal issues include, first, due process under the Fifth Amendment. Can the PTAB change claim construction midstream in an IPR without giving the patent owner notice? Number two, relying on disavowed claim construction. Isn't this simply a question of whether two references were properly combined? That's a substantial evidence question. I'm addressing the legal issues, the legal issues on claim construction. Those are also, there are two substantial evidence questions true. Who did the references teach or suggest the claims? The second legal issue is relying on a disavowed claim construction. Can the PTAB rely on a claim construction that it previously disavowed as being unreasonable to invalidate a patent in an IPR proceeding? The third regards functional gist. When can a PTAB reduce the claim language to a functional gist to invalidate a patent instead of looking at the actual words in the claim? The fourth legal issue is when can the PTAB read out words expressly recited in a claim? And the two issues regarding substantial evidence are whether Zolman and Rosteker, the combination, and the combination of Zolman and Bobin teach or suggest the claims. So let's look at the due process issue. Let's look at the facts briefly. In the institution decision, the board gave its first claim construction for the porous metal structure claim terms. Formal Bay relied on that claim construction in its response and presented all evidence based on that claim construction. In the final written decision, the board completely changed the claim construction from what was different in the institution decision and invalidated the patent based on the new claim construction. Formal Bay, we never had an opportunity to address the new claim construction. We never had an opportunity to present evidence of the new claim construction. And in fact, all the evidence that we presented was given little or no weight because the board said it was essentially directed to a wrong claim construction. So the indispensable right of due process is an opportunity of notice and to be heard, and we weren't given either by changing claim construction midstream. As I understood the institution decision, the claim construction for this bone fixation body or whatever the claim term is, they pretty much just tracked the plain language of the claim except for exchanging the word emulate for the word imitate? Correct. Okay, so how did it change from what is essentially a plain language interpretation of imitation to whatever you think they did at the final written decision? So procedurally, Your Honor, what happened is when petitioner Zimmer filed its initial petition, it asked for a claim construction. The claim recites a size and a shape of bone. That's what the porous material looks like. In its initial brief, Zimmer said, we want to replace that language, the structure language, with functional language just to say sufficiently porous for bone to grow. In the institution decision, the board said, I'm reading here, we're not persuaded by petitioner's proposed claim construction, i.e., a structure that is sufficiently porous so as to permit bone and growth. Petitioner's proposed claim construction does not give sufficient words or sufficient meaning to the words in the claim. That was correct. Then what the board did in the final written decision, they turned around and used that exact same claim construction that they disavowed in the initial decision and used it to invalidate the claims. Let me read the final written decision. They expressly, we credit specifically Dr. Harrigan's testimony that the porous metal structure disclosed to the board. I'm sorry, where are you in the board's decision? I don't have the, I quoted it. Just speak slowly and maybe I'll hunt around and find it while you're talking. This is the final written decision. It says, we credit specifically Dr. Harrigan's testimony that the porous metal structure. Page 34. The porous metal structure disclosed in Roesteker is sufficiently porous so as to permit bone and growth. And that satisfies the requirement for a porous metal structure having the size and shape of bone, a size and shape that emulate a size and shape of bone. So you can see in the final written decision they used the exact language that they previously disavowed in the initial decision. Isn't that tracking the claim language? The claim, no, not at all. You know, would have been motivated to fabricate Zolman's porous pad so as to have a porous fiber metal structure that emulates or imitates a size and a shape of a porous structure of natural human bone. I thought that was the claim language. No, the claim language recites that the porous structure has to have a size and a shape of natural human bone. The claim doesn't recite anything regarding the function. What the board did is it substituted the structure of size and shape of bone. That's the specific shape that it has to have. We'll forget about the shape of bone. We're just going to assume that it just has to have the function to promote bone and growth. But I guess what I'm saying is it quotes the claim language right in that sentence in 834, so as to have a porous fiber metal structure that emulates or imitates a size and a shape of a porous structure of natural human bone. It says it right there. Right, but they never address the issue. Does the art of record teach a structure that has a size and a shape of bone? It's a simple question because that's what the claim recites. Well, what about 824? We credit specifically Dr. Harrigan's testimony that the porous metal structure disclosed in Rostecker is sufficiently porous so as to permit bone and growth and satisfies the requirement for a porous metal structure having a size and a shape that emulate a size and a shape of a porous structure of natural human bone. Exactly. Then it goes on and says, moreover, we find Rostecker teaches fabricating a fiber metal structure that contains interconnecting pores and a controlled pore size such that the porosity of the metal structure approximates the porosity of surrounding bone permitting bone and growth. So, to me, I don't quite follow the line of your argument when you say that the board here in the final written decision abandoned the claim language and the claim interpretation that it chose in the institution which tracked the claim language when they're parroting the claim language right here in their analysis for why Rostecker, in fact, teaches this particular claim limitation. Well, what they should have said if they wanted to say that correctly is they should have said that Rostecker teaches the size and the shape of bone, which they didn't. In other words, they're avoiding the central issue in this case. Does the porous structure in the prior art have both the size and the shape of bone? That's the question. And then the question is what is the shape of bone? The other legal issue is when can a board read out limitations that are expressly recited in a claim? The claim recites that it has to have a size and a shape of bone. But in the final written decision, the board affirmatively read that out. They said we determined that the broadest reasonable interpretation consistent with the specification of the porous metal structure claim terms is they do not require emulating the size and the shape of bone. Where does it say that? That's in the final written decision. I don't have the page number. I mean, as I recall from the board's decision, they rejected your theory that emulating natural human bone is restricted to cancellous bone, right? Because they saw in the specification that human bone could be referring to cancellous bone or cortical bone. And so, therefore, it said that your narrow reading of limiting bone to just cancellous bone is too narrow and it couldn't accept that theory of the claim. Is that a correct understanding of what the board said? I understand you disagree with it, but is that a correct understanding of what the board said? Yes, that was what the board's position is. The problem with that argument is it disregards the claim language. I submitted publication evidence showing that the shape of bone, cortical and cancellous bone is the same. So was it cancellous or cortical? Regardless of whether the substantial evidence of both parties submitted evidence saying that it was cancellous bone, that aside, you still have to answer the question, does the porous metal structure of the prior art have the shape of bone? That's what the claim says, and that's the question that needs to be addressed when you're doing your analysis. They did not do that. In fact, they read it out. They read out, and there was nothing in the file history to read out anything from the claim that supported reading anything out from the claim. So my time's up. You could continue. It is your rebuttal time, and I'll save it for you. Okay, thank you. Mr. Park. Thank you. May it please the Court, I am Young Park, representing Petitioner and FLE Zimmer Biomet Holdings. I guess I'll just jump right into some of the arguments that were made by FMB in its opening remarks. First of all, there was no change in the claim construction between the institution and the final decision. As Judge Chen recognized, basically in the institution decision, the Board had substituted the word imitate for emulate, and in the final decision, the Board, again, maintained that plain meaning construction and rejected FMB's attempt to read into a limitation that the porous metal structure is required to have rods and plates that are seen in a particular type of bone, namely cancellous or trabecular bone. In addition, with regard to whether there's substantial evidence, this was a classic battle of experts where, for example, with the bobbin and Zolman combination, FMB argued that a person with a skill in the art would not have been able to make the bobbin material to wrap around the Zolman implant. Zimmer's expert provided testimony that a person with a skill in the art could have made that modification, and the Board accepted Zimmer's expert's testimony on that, and there's no substantial evidence demonstrating that the Board lacks substantial evidence to support its finding. There was another argument that if you were to use Zolman's manufacturing method on bobbin's material by pressing bobbin's material, it would end up crushing the material in bobbin. Yes, so to that, again, there's testimony in the record that, well, implicit in FMB's expert's testimony is that you can, that this material is strong and doctile, and so it would be able to withstand a certain amount of pressing, but that said, pressing wasn't even required. As the Board recognized, this is, bobbin is a material that can be made into complex shapes, and so as KSR teaches, you don't necessarily have to kind of follow the prior art teaching on a one-to-one scale and do exactly what the prior art, one of the prior art references taught. A person with a skill in the art would have skill and creativity to modify the prior art methods to make one reference's teaching work with the other reference's teaching. Did the Board say that? Did the Board say when using bobbin's material on Zolman's device, you would just use whatever manufacturing method to make bobbin's material and not use Zolman's manufacturing method for the pad? No, actually, again, I was just specifically addressing Your Honor's question. Yeah, I thought you said that the Board said that, so that's what I'm trying to figure out, if the Board actually said that. No, the Board applied the teaching from Zolman in combination with bobbin's teachings, where basically you could make the porce pad and you could wrap that porce pad around the implant, and the Board relied on evidence presented by Zimmer's expert, Dr. Harrigan. Right, the Board relied on your expert's argument that bobbin's material could handle Zolman's pressing. Is that right? To be fair, I don't think the issue of pressing was necessarily presented through Dr. Harrigan's testimony, and the reason why is because it wasn't necessary to have a pressing step. So in Zolman, the pressing step is one of the initial steps that are taken where you form the porce pad. So what did the Board say about Zolman's pressing? The Board said nothing? I don't recall the Board. I'll recheck the record, but I don't recall the Board saying anything about pressing. If they did say something about pressing, it would have been to the effect of bobbin's material is stated to be strong, so it would be able to withstand a certain amount of pressing. But I think the point here is that the Board did recognize that bobbin's material could be made into very complex shapes, and so you would just avoid the pressing step altogether. It's just not necessary. That's the testimony from Harrigan. And the Board said that? I don't think the Board said it because that evidence wasn't presented in that manner through Dr. Harrigan's testimony. So Dr. Harrigan and the Board recognized you have this material that can be made into a complex shape, and so you wouldn't need to do the pressing step that you would need with a Zolman-centered wire embodiment. And so you just basically make the pad with the bobbin material, and then you would avoid the pressing step. All you need to do is just work around the step. But you don't know if the Board said that? Honestly, I do not recall right now saying that specific piece of information. What about Rosteker? How is the pore structure, the size and shape of Rosteker's material, the same or imitate the size and shape of natural human bone? Sure. So first of all, I would like to point out that FMB does not challenge whether Rosteker discloses the porous metal structure claim terms under the Board's claim construction. They argue that Rosteker doesn't disclose the plates and rods that one may find in a particular type of natural bone, which is cancerous bone. But to answer your Honor's question, there is testimony from Dr. Harrigan, Zimmer's expert, saying that the pore size and shape in Rosteker could be modified so that it matches the pore diameter and the porosity and the characteristics for the porous metal structure that was disclosed in the specification of the 582 patent. One thing I'd like to clarify is that on a few occasions, FMB's counsel characterized the asserted claim limitation, the disputed claim limitation as a size and shape of bone. It's actually a porous structure, a porous metal structure having a size and shape that emulates a size and shape of the porous structure of natural bone. So again, it's not specifically directed to the microstructures that are forming the pores in the porous structure. I know I still have a large amount of time left to me, but if your Honors do not have any additional questions. No one ever loses points for not using up all of their time. Mr. Clark. Mr. Lauren, do you have some rebuttal time? Thank you. Zimmer mentioned that there was no change in claim construction. I respectfully ask you to compare the claim construction in the institution decision with the claim construction in the final written decision. They're very different. With regard to substantial evidence, and let's look at Zolman and Bowman. Zolman method requires three steps. Press, cut, and bend. Council's now saying that it doesn't require those steps. I don't know. That's the first I've heard of this. This is a new argument to me, and it wasn't presented to the board. Formal Bay presented a publication evidence called the Main Publication. The Main Publication was published by Dr. Matthew Frank, who's professor emeritus at Iowa State University. In that publication, they took Bowman's material, exact same material, and they said, let's try to cut it. They failed. Could not do it. This was five years after filing the patent application. They came up with a new patented method to actually cut it. It's called infiltration, and then they filed a patent on it. They figured out a way. In that publication, and I submitted the diagrams. They go into great detail. They show diagrams, why you can't cut this material, because it's ductile, because it deforms, it destroys the material. In the final written decision, here's what the PTAB said about that. The PTAB basically said, we're not going to give any weight to that evidence, because it's, quote, directed to a more fragile version of the material. How can it be directed to a more fragile version of the material when the Main Publication showed pictures of Bowman's material, actually cited Bowman's article, saying this is the material we're going to try to cut. Oh, we can't cut it. It failed. It destroyed it. There was also another publication that was... Well, the board at 843 was talking about how your expert, Dr. Hemis, was saying, well, it was commenting about, he was commenting about Bowman's biomaterial and how you would have problems if it, Bowman's material, were made to emulate human bone. And so the board was confused by these statements by Dr. Hemis and Dr. Vinceli about if you were to make Bowman's material to emulate the structure of human bone, and so the board concluded that the experts were not actually addressing the specific material taught in Bowman. Well, Bowman's material does emulate the structure of human bone, and most experts said that. But there was some kind of equivocation in the experts' testimony about making an adjustment to Bowman's biomaterial, and then if you were to make that adjustment, then here are the kinds of problems you would have to that version, not the actual version of Bowman's material itself. As I understand it, that was the board's criticism of these two doctors' testimony. You know, I'll give a short closing. There's not that much time. I travel all around Asia, Hong Kong, China, Singapore, and I give talks on U.S. patent law. And I give talks to large universities, technology centers and technology companies, some of the largest in the world. These entities file patents all around the world, including the United States. At the end of almost every single presentation, I get the same question from an audience member. Why should we spend our money to file a patent in the United States when most of the patents are invalidated by the PTAB anyhow? You know what? They're right. The patent owner has no chance to win at the PTAB. If the PTAB can change claim construction midstream and not give notice and an opportunity to be heard based on that claim construction, can reduce it to a functional gist, can read out in the final written decision structure in the claim, can disregard publication evidence based on a nebulous concept of what material was being cut when they said it was Bowdoin's material by a team of disinterested scientists, disinterested scientists, couldn't cut the material. When the board can do that, the patent owner doesn't have a chance to win. This court has an opportunity to change how the PTAB invalidates patents using claim construction. Thank you for your time. Thank you, Mr. Lyron. I appreciate your presentation. I'll take the case from the submission. That concludes today's arguments. All rise.